UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN A. MONROE,

                Plaintiff,

     -v-

COUNTY OF ORANGE, and ORANGE COUNTY
SHERIFF'S OFFICE,

              Defendants.

Case No. 14-CV-1957 (KMK)

OPINION & ORDER

Appearances:

Jimmy M. Santos, Esq.
Law Offices of Jimmy M. Santos, PLLC
Cornwall, NY
*Counsel for Plaintiff*

Kellie E. Lagitch, Esq.
Office of the Orange County Attorney
Goshen, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

     Plaintiff John Monroe ("Plaintiff"), a former correction officer employed by the Orange

County Sheriff's Office (the "OCSO"), brings this action against the OCSO and the County of

Orange (collectively, "Defendants"), asserting claims for unlawful termination and failure to

accommodate in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C.

§ 12101 et seq., and retaliatory discharge in violation of the Family and Medical Leave Act (the

"FMLA").[1]  Defendants have moved for summary judgment.  For the reasons to follow,

Defendants' Motion is denied in part and granted in part.

## I. Background

### A. Factual Background

The following facts are taken from the Parties' statements of material facts and the

documents contained in the record.

Sometime as early as the year 2000, Plaintiff's now-wife, Josephine Monroe, noticed that

Plaintiff appeared to suffer from symptoms that resembled a panic or anxiety attack, such as

having sweaty palms, general discomfort, a rapid heartbeat, and unsteady breathing.  (Aff. of

Josephine Monroe ("Josephine Monroe Aff.") ¶¶ 2–3 (Dkt. No. 40).)  To the best of her

knowledge, around 2004, Plaintiff was then diagnosed as having panic disorder with

agoraphobia.  (*Id.* ¶ 4.)  Between these events, Plaintiff began working as a correction officer

with the OCSO's corrections division, sometime around November 1, 2001.  (Defs.' Rule 56.1(a)

Statement ("Defs.' 56.1") ¶ 1 (Dkt. No. 33); Pl.'s Counter-Statement of Facts Pursuant to Local

Rule 56.1 ("Pl.'s 56.1") ¶ 1 (Dkt. No. 42).)  In connection with that position, Plaintiff went

through two appointments on provisional status followed by a probationary period, and then

achieved permanent status as a correction officer on August 23, 2004.  (Defs.' 56.1 ¶¶ 1–3, Pl.'s

56.1 ¶¶ 1–3.)

Beginning in 2011, Plaintiff's attendance began to lag: That year, he was absent from

work due to an unspecified illness at least 32 times.  (Defs.' 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.)  Similarly,

Plaintiff was absent for a considerable portion of the first half of the next calendar year, using

---

[1] Plaintiff voluntarily withdrew his FMLA retaliation claim.  (Pl.'s Memo of Law in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") 1 n.1 (Dkt. No. 44).)

sick time, vacation time, "chart time," and personal time to miss work from March 28, 2012

through June 29, 2012.  (Defs.' 56.1 ¶ 9; Pl.'s 56.1 ¶ 9.)[2]  During that period of time, Plaintiff

would call the OCSO to let them know he would be out on a particular day, (Defs.' 56.1 ¶ 11;

Pl.'s 56.1 ¶ 11); however, the Parties dispute whether Plaintiff also advised the OCSO that he

intended to be absent for three months: According to Defendants, he did not, (Defs.' 56.1 ¶ 10

(citing Decl. of Kellie E. Lagitch ("Lagitch Decl.") Ex. J ("Pl.'s Dep. Tr.") 56–57 (Dkt. No.

29))), but, according to Plaintiff, sometime between March and June 2012, Plaintiff discussed

with Colonel Dominick Orsino ("Colonel Orsino") that it would be a good idea for Plaintiff to

take an extended leave of absence due to his panic disorder, (*see* Pl.'s 56.1 ¶ 10 (citing Pl.'s Dep.

Tr. 86–88; Aff. of John Monroe ("Pl.'s Aff.") ¶ 15 (Dkt. No. 39); Josephine Monroe Aff. ¶ 6;

*see also* Pl.'s Rule 56.1(b) Statement of Additional Facts Which Pl. Contends Shows There Exist

Genuine Issues of Material Fact ("Pl.'s Counter 56.1") ¶ 70 (Dkt. No. 42)).[3]  Around that same

time, on May 23, 2012, Plaintiff also began treatment with Dr. Linden Schild ("Dr. Schild") for

his anxiety/panic disorder and ADHD, (Defs.' 56.1 ¶ 12; Pl.'s 56.1 ¶ 12), switching to her from

his previous psychiatrist, Dr. Shreyas Baxi, because his symptoms had worsened.  (Pl.'s Counter

---

[2] According to Plaintiff, "[c]hart time is the time you've just accrued from working." (*See* Decl. of Kellie E. Lagitch ("Lagitch Decl.") Ex. J, at 50–51 (Dkt. No. 29).)

[3] In addition to Exhibit J to the Lagitch Declaration, portions of Plaintiff's deposition transcript are attached to Plaintiff's counsel's declaration.  (*See* Decl. of Jimmy M. Santos ("Santos Decl.") Ex. 1 ("Pl.'s Dep. Tr.") (Dkt. No. 38).)  Going forward, this Opinion will cite Plaintiff's deposition transcript generally, regardless of which exhibit it was assigned by the Parties.

Here, the portion of his deposition transcript that Plaintiff cites for this proposition does not clearly support it.  Instead, these pages relate to a conversation that Plaintiff had with Colonel Orsino "probably just before [Plaintiff] came back" about "coming back and working in smaller units."  (*See* Pl.'s Dep. Tr. 86–88.)

56.1 ¶ 69 (citing, inter alia, Pl.'s Aff. ¶¶ 12–16)).[4]  According to Plaintiff, Dr. Schild had him

begin a new medication regimen and set of breathing techniques, after which Plaintiff's panic

disorder symptoms improved.  (*Id.* ¶ 72 (citing Pl.'s Aff. ¶¶ 16–18).)

Despite Plaintiff's ongoing treatment, the OCSO did not receive any record indicating

that Plaintiff was seeing a psychiatrist until receiving a letter dated June 13, 2012 from Dr.

Schild, (Defs.' 56.1 ¶¶ 12–14; Pl.'s 56.1 ¶¶ 12–14)), in which he noted that Plaintiff "presented

for follow up on 6/12/12, and . . . reported significant improvement," and recommended that

Plaintiff return to work full duty on June 19, 2012, (*see* Lagitch Decl. Ex. L ("Dr. Schild's June

13, 2012 Letter")).[5]  Rather than resuming work on June 19, 2012, Plaintiff took an additional

five vacation days and four more personal days, ultimately returning to work at the OCSO on

June 30, 2012.  (Defs.' 56.1 ¶ 15; Pl.'s 56.1 ¶ 15.)  Shortly before doing so, according to

Plaintiff, Colonel Orsino agreed to allow Plaintiff to work at housing unit posts with fewer

inmates and no minors.  (*See* Pl.'s Counter 56.1 ¶ 71 (citing, inter alia, Pl.'s Dep. Tr. 86–89;

Santos Decl. Ex. 6 ("DiMarco Dep. Tr."), at 24–25 (Dkt. No. 38)).)  Indeed, Plaintiff was

assigned to units with fewer inmates, (*see* DiMarco Dep. Tr. 24–25), and, between July 1, 2012

and August 14, 2012, Plaintiff did not have a panic attack, (*see* Pl.'s Aff. ¶ 18)).  Despite this

putative temporary accommodation, Plaintiff asserts that he never requested being reassigned to

a different permanent position, (*see* Pl.'s Counter 56.1 ¶¶ 78, 81–82 (citing, inter alia, Pl.'s Aff.

¶¶ 25–27)), and Defendants' employees neither asked Plaintiff what accommodations he was

---

[4] The cited exhibit suggests that ADHD refers to "[a]ttention deficit disorder of childhood with hyperactivity."  (*See* Lagitch Decl. Ex. K (medical records).)

[5] Defendants in their 56.1 Statement, in fact, refer to Dr. Schild's June 13, 201<u>3</u> letter, (Defs.' 56.1 ¶ 13), an error to which Plaintiff does not object, (*see* Pl.'s 56.1 ¶ 13); however, this is plainly a typo, (*see* Dr. Schild's June 13, 2012 Letter); *see also* Defs.' 56.1 ¶ 14 (referring to Dr. Schild's June 13, 2012 letter)).

requesting or could benefit from, (*id.* ¶ 79 (citing Pl.'s Aff. ¶ 23); *see also id.* ¶ 81 (noting

Defendants did not ask if Plaintiff wanted to work on a permanent light-duty basis (citing, inter

alia, Pl.'s Aff. ¶¶ 25–27)), nor asked his doctors for any information, (*id.* ¶ 80 (citing Pl.'s Aff.

¶ 24)).

On August 14, 2012 at 3:15 p.m., Sergeant Keith Kiszka ("Sergeant Kiszka") directed

Plaintiff to report to Bravo-2, a housing unit with up to 56 inmates, in order to relieve the day

shift and avoid any overtime.  (Defs.' 56.1 ¶ 17; Pl.'s 56.1 ¶ 17.)  Plaintiff was also directed to

start the logbook and, consistent with established policy, perform an inmate headcount at shift

change.  (Defs.' 56.1 ¶¶ 17–18; Pl.'s 56.1 ¶¶ 17–18.)  Upon being told to report to Bravo-2,

Plaintiff began to hyperventilate and breathe heavily, and he was ultimately relieved of his post

in Bravo-2 just 10 minutes later at 3:25, whereupon he returned to the Command-2 Office to

meet with Sergeant Kiszka and Lieutenant Domenic DiMarco ("Lieutenant DiMarco").  (*See*

Defs.' 56.1 ¶¶ 17, 19–20; Pl.'s 56.1 ¶¶ 17, 19–20.)  There, Plaintiff told Sergeant Kiszka and

Lieutenant DiMarco that he "had a panic attack when he heard he was going to Bravo-2," and,

indeed, was still in the throes of an anxiety attack upon his return to the Command-2 Office.

(Defs.' 56.1 ¶ 20; Pl.'s 56.1 ¶ 20.)  Accordingly, Lieutenant DiMarco directed Plaintiff to report

to medical to have his blood pressure checked, and, once Plaintiff returned, Sergeant Kiszka and

Lieutenant DiMarco told Plaintiff—who was still experiencing the symptoms of a panic attack—

to see his own physician and to "return to work with a note clearing [Plaintiff] for his own

safety."  (Defs.' 56.1 ¶¶ 20–21; Pl.'s 56.1 ¶¶ 20–21.)

That evening, Plaintiff drove to see Dr. Schild at 6:30 p.m. for the first time since their

June 12, 2012 appointment, and said that he was ready to return to work, "but not the largest

dorms, and not working with minors."  (Defs.' 56.1 ¶¶ 23–24, 26; Pl.'s 56.1 ¶¶ 23–24, 26.)

Plaintiff left their session with a note indicating that he was ready to return to work as the "symptoms" of his panic attack "had resolved," although Plaintiff continued experiencing symptoms of the panic attack that evening until 9:00 pm or 10:00 pm, after leaving Dr. Schild's office.  (Defs.' 56.1 ¶¶ 25–27; Pl.'s 56.1 ¶¶ 25–27; Lagitch Decl. Ex. Q ("Dr. Schild's Aug. 14, 2012 Letter").)  Before driving home, Plaintiff returned to the correctional facility to give Sergeant Kiszka the note, which also indicated that "the risk of future, similar episodes [could] be reduced if [Plaintiff] [was] assigned dorms of [fewer] than 30 inmates, and which [would] not contain minors."  (Defs.' 56.1 ¶ 27; Pl.'s 56.1 ¶ 27; Dr. Schild's Aug. 14, 2012 Letter.)

When Plaintiff arrived to work the next day, August 15, 2012, he was told that Captain Mele wanted to see him.  (Defs.' 56.1 ¶ 28; Pl.'s 56.1 ¶ 28.)  During that meeting, Plaintiff, as he had done before, relayed his concerns that he would become anxious the night before he had to return to work because "anything could happen," including "inmate fights, stabbings, attempted suicides," and inmate threats.  (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.)[6]  In the course of that conversation, according to Plaintiff, Captain Mele throughout told him that Dr. Schild's August 14, 2012 letter "'[wasn't] going to fly,'" posited that "this was [not] the job for [Plaintiff]," and discussed with Plaintiff that he should go back to working at a car dealership, but said that there was "no more talking to [Plaintiff's] wife" about whether he would leave his job.  (*See* Pl.'s Dep. Tr. 121–25.)  Similarly, Captain Mele testified that he told Plaintiff that Colonel Orsino indicated that Plaintiff had to work "full active duty . . . with no restrictions."  (*See* Santos Decl. Ex. 4

---

[6] Defendants assert that "Plaintiff testified at deposition [sic] that he would suffer from anxiety/panic attacks every Monday (his day off) because he knew he had to return to work the following day and 'anything could happen that day when I go back.'"  (Defs.' 56.1 ¶ 30 (citing Pl.'s Dep. Tr. 135–36).)  While Plaintiff "[a]dmit[s]" this, (*see* Pl.'s 56.1 ¶ 30), neither Party's excerpts from Plaintiff's Deposition Transcript include these pages.

("Mele Dep. Tr."), at 58.)[7]  According to Plaintiff, Captain Mele said that Plaintiff could return

in six months, gave him a piece of paper, and instructed him to write a letter of resignation, (*see*

Pl.'s Dep. Tr. 125; *see also* Santos Decl. Ex. 15 ("First Resignation Letter")), before coming

back and telling him to add the phrase "for personal reasons," (*see* Pl.'s Dep. Tr. 126; *see also*

Santos Decl. Ex. 16 ("Second Resignation Letter"), although, according to Captain Mele, he

simply told Plaintiff that "he needed to put a reason," and told Plaintiff that "[a] lot of people

write: Due to personal reasons," (*see* Mele Dep. Tr. 64).  According to Plaintiff, instead of

soliciting his resignation, Defendants could have transferred him to a number of different

positions at the correctional facility, (*see* Pl.'s Counter 56.1 ¶¶ 83–84 (citing, inter alia, Pl.'s Aff.

¶¶ 24, 28–29)).

     Although both Plaintiff and Defendants agree that during Plaintiff's conversation with

Colonel Orsino on August 15, 2012, Plaintiff never indicated that Captain Mele coerced him into

signing the resignation letter, nor did he advise Colonel Orsino that he believed Captain Mele

had acted inappropriately in obtaining the letters, (*see* Defs.' 56.1 ¶ 33; Pl.'s 56.1 ¶ 33),

Defendants unsurprisingly characterize Plaintiff's putative resignation differently.  As they

describe it, after the incident on August 14, 2012, Colonel Orsino determined that Plaintiff's

inability to perform his duties compromised his safety and those of his co-workers and the

inmates, and that Plaintiff "resigned his post" on August 15, 2015, "personally submit[ing] his

resignation letter" to Colonel Orsino.  (Defs.' 56.1 ¶¶ 31–32 (citing Pl.'s Dep. Tr. 138–39; Mele

Dep. Tr. 53).)  Defendants maintain that Plaintiff expressed no reluctance to Colonel Orsino and

---

[7] Captain Mele's deposition transcript also appears in part in Exhibit O to the Declaration
of Kellie E. Lagitch.

thanked both Colonel Orsino and Captain Mele for everything they had done for him.  (*Id.* ¶ 34 (citing Pl.'s Dep. Tr. 69, 138–39; Mele Dep. Tr. 69).)

After Plaintiff's putative resignation, there was some thought surrounding the possibility of his return.  On August 15, 2012, Plaintiff's wife told him that he should try to get his job back.  (Defs.' 56.1 ¶ 35; Pl.'s 56.1 ¶ 35.)  The next day, Plaintiff contacted Captain Mele to ask whether Plaintiff could be reinstated, and Captain Mele asked Colonel Orsino whether Plaintiff could return to work on the overnight shift, although Colonel Orsino indicated that Plaintiff could not return to the correctional facility without further treatment and being cleared by another doctor.  (Defs.' 56.1 ¶¶ 36–37; Pl.'s 56.1 ¶¶ 36–37.)  Next, by letter dated August 28, 2012, Dr. Schild— scarcely a week after meeting with Plaintiff—indicated that Plaintiff's "residual panic symptoms" had resolved, and that he was "functioning at his baseline."  (Defs.' 56.1 ¶¶ 39–40; Pl.'s 56.1 ¶¶ 39–40; *see also* Lagitch Decl. Ex. CC (Schild's Aug. 28, 2012 Letter).)  Although Plaintiff began working for his brother-in-law's company, Dwyer Leavenworth, doing construction regularly from September 2012 until December 2012, Plaintiff wrote a letter dated October 15, 2012 to Colonel Orsino attempting to rescind his August 15, 2012 resignation.  (Defs.' 56.1 ¶¶ 47–48; Pl.'s 56.1 ¶¶ 47–48.)  On October 31, 2012, Plaintiff again wrote to Colonel Orsino threatening legal action if Plaintiff did not obtain a response to his October 15 letter, and, on November 4, 2012, Colonel Orsino responded, noting that Plaintiff did not mention coercion when he submitted his resignation letter or in their subsequent meeting a few days later.  (Defs.' 56.1 ¶¶ 49–50; Pl.'s 56.1 ¶¶ 49–50.)  Although Plaintiff did not seek employment at any other correctional facilities since separating from the correctional facility, he did continue looking for other work, and, on February 27, 2013, began working for Boreal Water

Collection, where he received a promotion in June 2014 and continues to work four ten-hour shifts each week to date.  (Defs.' 56.1 ¶¶ 52–53; Pl.'s 56.1 ¶¶ 52–53.)

Shortly after his separation from the correctional facility, Plaintiff also began the process of obtaining unemployment benefits, filing his application on August 17, 2012.  (*See* Defs.' 56.1 ¶ 38; Pl.'s 56.1 ¶ 38; Lagitch Decl. Ex. T (unemployment application).)  To that end, the appropriate Human Resources department completed a questionnaire dated September 5, 2012, concerning Plaintiff's employment, and, according to that questionnaire, Plaintiff "resigned in writing." (Lagitch Decl. Ex. DD (questionnaire) 2.)[8]  Shortly thereafter, on September 10, 2012, during a conversation with Rita T. Turner ("Turner") of the New York State Unemployment Insurance Division ("UID"), Plaintiff said that he wrote the letter of resignation, but selected "fired unable to meet standards" by accident, and further explained that he was "not at risk of being terminated," but that he could have continued working and that "[n]o doctor advised [him] to leave [his] job," but that "[he] made a decision in haste and . . . [was] trying to get [his] job back."  (Defs.' 56.1 ¶¶ 42–43; Pl.'s 56.1 ¶¶ 42–43.)  Additionally, the evidence reflects that, on October 10, 2012, Plaintiff sent a letter to the UID indicating that Turner told him that "since [he] resigned from [his] job, [he] could not collect unemployment," but that "[he] was informed by [his] attorney . . . to re-submit the unemployment claim, due to the fact that [he] was fired and there was no way [he] was going to be working," and that, although "[he] [was] currently working construction," "full time work [was] not available at th[e] time," and that, accordingly,

---

[8] Defendants note this questionnaire in their 56.1 ¶ 41, asserting that, "[o]n or about September 5, 2012, the County's Human Resources Department completed a questionnaire from the NYS Unemployment Insurance Division . . . confirming that Plaintiff had resigned his position as of August 15, 2012."  Plaintiff denies this, pointing to his assertion contradicting an earlier statement of Defendants' 56.1.  However, in that place, Plaintiff said nothing about his process of applying for unemployment benefits.  (*See* Pl.'s 56.1 ¶ 32.)

he "wish[ed] to claim part time unemployment" for certain dates.  (Lagitch Decl. Ex. V (email from Pl.).)[9]

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on December 14, 2012, from which he received a Notice of Dismissal and Right to Sue letter dated February 10, 2014.  (Defs.' 56.1 ¶ 54; Pl.'s 56.1 ¶ 54.)  According to the EEOC's letter, "although [Plaintiff] claim[ed] that Respondent failed to accommodate [his] limitations, [Plaintiff's] medical documentation and own testimony belie[d] [his] claim that [he] even required limitations."  (Defs.' 56.1 ¶ 55; Pl.'s 56.1 ¶ 55.)  Although the Parties agree that the correctional facility has a temporary light duty policy that provides officers either injured off duty or with an off-duty illness with temporary light-duty assignment, (Defs.' 56.1 ¶ 56; Pl.'s 56.1 ¶ 56), they dispute how such requests are made and whether Plaintiff ever made one. According to Defendants, light-duty requests are to be submitted to the undersheriff in accordance with the correctional facility's written policy, something Defendants say that Plaintiff never did.  (*See* Defs.' 56.1 ¶¶ 57–58 (citing Lagitch Decl. Ex. FF ("Light Duty Policy"); Pl.'s Dep. Tr. 83–86).)  According to Plaintiff, however, "verbal 'informal' requests" for light duty were "frequently made" and "readily granted."  (Pl.'s 56.1 ¶ 57 (citing Pl.'s Dep. Tr. 28–29; Santos Decl. Ex. 3 ("Jones Dep. Tr."), at 37–41, 51–62, 68–70; Mele Dep. Tr. 18–19, 25–38; Kiszka Dep. Tr. 15–21, DiMarco Dep. Tr. 21–22, 26–28, 30–32, 41; Pl.'s Aff. ¶¶ 24, 28–29).) Moreover, Plaintiff disputes that he never made such a request, asserting that he discussed with Colonel Orsino that it would be a good idea for Plaintiff to take an extended leave of absence,

---

[9] In their 56.1 statement, Defendants claim that, "[b]y email dated October 10, 2012, [P]laintiff sent an inquiry to the General Inquiries mailbox at the UID indicating that he wished to resubmit his claim for benefits, ***pursuant to his attorney's instructions***, because he had been fired by the Corrections Division."  (Defs.' 56.1 ¶ 45 (emphasis in original).)  Plaintiff denies this, citing to ¶ 32 of his 56.1 statement; however, ¶ 32 says nothing about this email.

and that, after his August 14, 2012 panic attack, Plaintiff was directed to see his psychiatrist, who wrote a note ultimately provided to Plaintiff's superiors, indicating that "similar episodes" could "be reduced" if Plaintiff were "assigned dorms of [fewer] than 30 inmates, . . . which do not contain minors."  (Pl.'s 56.1 ¶ 58 (citing Pl.'s Dep. Tr. 86–88; Mele Dep. Tr. 47–53; Kiszka Dep. Tr. 44–45; Schild's Aug. 14, 2012 Letter; Pl.'s Aff. ¶¶ 15, 20, 23–24, 26; Josephine Monroe Aff. ¶¶ 6, 10, 13, 15).)

B. Procedural Background

On March 20, 2014, Plaintiff filed his initial complaint, (*see* Dkt. No. 1), and, after a pre-motion conference was held, (*see* Dkt. (minute entry for July 15, 2014)), Plaintiff amended his complaint, (*see* Dkt. No. 7).  Defendants answered, (*see* Dkt. No. 8), and, after mediation failed, (*see* Dkt. No. 10), a case-management order was entered in advance of discovery, (*see* Dkt. No. 12).  In response to a request from Defendants, (*see* Dkt. No. 22), the Court held a pre-motion conference, (*see* Dkt. (minute entry for Oct. 16, 2015)), and Defendants were granted leave to move for summary judgment, (*see* Dkt. No. 25).  On December 14, 2015, Defendants filed their Motion and accompanying papers, (*see* Dkt. Nos. 28–33); by February 26, 2016, Plaintiff filed his Opposition and accompanying papers, (*see* Dkt. No. 38–44); and Defendants submitted their Reply papers on March 14, 2016, (*see* Dkt. No. 45–46).

II. Analysis

A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary

judgment is properly supported by documents or other evidentiary materials, the party opposing

summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At summary

judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks

omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21-88,

2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's goal should be "to

isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs.*

*Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted).

    B.  Discussion

        1.  Overview of the Relevant Law

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on

the basis of disability in regard to job application procedures, the hiring, advancement, or

discharge of employees, employee compensation, job training, and other terms, conditions, and

privileges of employment."  42 U.S.C. § 12112(a).  "ADA employment discrimination claims are

subject to the familiar burden-shifting analysis established by the Supreme Court in *McDonnell*

*Douglas Corp. v. Green*."  *Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 231 (2d Cir. 2015)

(internal quotation marks omitted).  That framework entails a three-part analysis, under which a

plaintiff must first "establish a prima facie case," after which "the employer must offer through

the introduction of admissible evidence a legitimate non-discriminatory reason for the

discharge," before the plaintiff must ultimately "produce evidence and carry the burden of

persuasion that the proffered reason is a pretext." *Id.* (internal quotation marks omitted). Here, although they acknowledge the applicability of the *McDonnell Douglas* framework, (*see* Mem. of Law on Behalf of Defs. ("Defs.' Mem.") 8 (Dkt. No. 32)), Defendants, in essence, argue only that Plaintiff has failed to meet the test for a prima facie case of discrimination under the ADA, (*see id.* at 8–20).[10]  Plaintiff has brought two sorts of disability claims: (1) a claim for unlawful termination on account of his disability, record of having a disability, and/or being regarded as having a disability in violation of the ADA, (*see* Am. Compl. ¶¶ 31–32 (Dkt. No. 7)) and (2) failure to grant Plaintiff reasonable accommodation in violation of the ADA, (*see id.* ¶¶ 33–34).

With regard to the former, in order to bring a claim pursuant to § 12112(a)'s proscription of the "discharge of employees" on "the basis of disability," a plaintiff must

> show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.

*McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (internal quotation marks omitted); *see also Pesce v. N.Y.C. Police Dep't*, 159 F. Supp. 3d 448, 456 (S.D.N.Y. 2016)

---

[10] It merits noting that, in their "preliminary statement," after explaining their basis for arguing that Plaintiff failed to establish a prima facie case, Defendants go on to argue that, "should the Court determine that [P]laintiff has established a prima facie claim, the County Defendants[] have articulated a legitimate, non-discriminatory motive for their actions—namely, [P]laintiff's inability to effectively perform his duties was a significant safety concern in a correctional facility housing approximately 620 inmates at a given time." (Defs.' Mem. 1.) Defendants do not, however, present any arguments in their brief concerning the second step of the *McDonnell Douglas* framework, but rather argue that Plaintiff was a direct threat to safety within the meaning of the ADA. (*See* Defs.' Mem. 15–17.) These are not the same thing. *Cf. Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 171 (2d Cir. 2006) (concluding that terminating an employee for making a threat implicates the second step of the *McDonnell Douglas* framework, not the direct threat analysis). Because, despite this line, the Parties do not engage in analysis of the second *McDonnell Douglas* step, the Court does not understand the issue to be part of the instant Motion.

(same).  With regard to a failure-to-accommodate claim, a plaintiff states a prima facie claim by

demonstrating that:

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an
> employer covered by the statute had notice of his disability; (3) with reasonable
> accommodation, plaintiff could perform the essential functions of the job at issue;
> and (4) the employer has refused to make such accommodations.

*McMillan*, 711 F.3d at 125–26; *see also Thomson v. Odyssey House*, — F. App'x —, 2016 WL

3391268, at *2 (2d Cir. June 16, 2016) (same); *Gomez v. N.Y.C. Police Dep't*, — F. Supp. 3d —,

2016 WL 3212108, at *5 (S.D.N.Y. June 7, 2016) (same).  Most of Defendants' arguments for

summary judgment are equally applicable to both claims; therefore, the Court will analyze them

in the manner presented by Defendant.

### 2.  Was Plaintiff Disabled Within the Meaning of the ADA?

To begin, "not every impairment is a 'disability' within the meaning of the ADA,"

*Kruger v. Hamilton Manor Nursing Home*, 10 F. Supp. 3d 385, 388 (W.D.N.Y. 2014), and an

employee will be said to have a legally cognizable disability in three circumstances—that is, if,

first, he or she has "a physical or mental impairment that substantially limits one or more major

life activities of such individual," 42 U.S.C. § 12102(1)(A), second, there is a "a record of such

an impairment," *id.* § 12102(1)(B), or, third, the employee is "regarded as having such an

impairment" as further described in the statute, *id.* § 12102(1)(C).  Defendants seek summary

judgment on the grounds that none is applicable.  (*See* Defs.' Mem. 9–12, 18–21.)

### a.  Did Plaintiff have a sufficient "physical or mental impairment"?

With respect to whether Plaintiff had, within the meaning of § 12102(1)(A), an actual

disability, the statute and corresponding regulations flesh out the meaning of many of these

phrases: For one thing, "mental impairment[s]" include "[a]ny mental or psychological disorder,

such as an . . . emotional or mental illness."  29 C.F.R. § 1630.2(h).  Additionally, major life

activities are statutorily defined to include "breathing . . . , concentrating, thinking, communicating, and working," 42 U.S.C. § 12102(2)(A), and the Equal Employment Opportunity Commission's regulations make clear that "[w]hether an activity is a 'major life activity' is not determined by reference to whether it is of 'central importance to daily life,'" 29 C.F.R. § 1630.2(i)(2).  Additionally, under the applicable regulations, "an impairment 'substantially limits' a major life activity if the impaired person is 'significantly restricted as to the condition, manner or duration under which [he] can perform' the activity."  *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 68 (2d Cir. 2014) (alteration omitted) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)).  Nevertheless, "[t]he term 'substantially limits'"—which "is not meant to be a demanding standard"— is "construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."  29 C.F.R. § 1630.2(j)(1)(i).  Indeed, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting," *id.* § 1630.2(j)(1)(ii), and an impairment will not fall outside the statute's protections simply because it is episodic or in remission (provided the impairment would otherwise substantially limit a major life activity), *id.* § 1630.2(j)(1)(vii), or because it substantially limits just one major life activity, *id.* § 1630.2(j)(1)(viii).  Stated more generally, "[a]n impairment is a disability within the meaning of th[e] section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  *Id.* § 1630.2(j)(1)(ii).

In this case, the crux of Defendants' argument is not that Plaintiff did not suffer from a mental impairment—he did, *see id.* § 1630.2(h)(2) (defining "[p]hysical or mental impairment" to include "[a]ny mental or psychological disorder")—but that it did not substantially limit a major life activity, (*see* Defs.' Mem. 9–11).  And while Defendants recognize that Plaintiff

alleges that "at certain relevant times," Plaintiff's breathing, hearing, and abilities to communicate, work, think clearly, and concentrate are affected, (*see* Defs.' Mem. 9–10 (quoting Am. Compl. ¶ 15)); they argue that these are "mere[] symptoms," and transitory ones at that, which, if accepted, would "essentially eviscerate the ADA's requirement that an impairment substantially limit an individual's ability to perform a major life activity," (*id.* at 10).  Instead, Defendants maintain that it would therefore "appear that [P]laintiff's primary contention is that his panic disorder substantially limits his ability to work" as a correction officer, a proposition they likewise repudiate on the grounds that Plaintiff, if anything, was "limited in his ability to work as a correction officer," not in his ability to work more generally.  (*See id.* at 10–11.) Therefore, the analysis surrounding whether Plaintiff had a condition that "substantially limit[ed] one or more major life activities," 42 U.S.C. § 12102(1)(A), can be broken into two sub-questions: First, whether those limitations that Defendants write off as mere symptoms are sufficient, and, second, whether Plaintiff's ability to work was substantially limited.

i. <u>Breathing, Concentrating, Thinking, and Communicating</u>

Defendants' argument notwithstanding, Plaintiff in his Opposition reiterates that his "panic attacks affect[ed] [his] major life activities of breathing, being able to concentrate, think, and communicate."  (Pl.'s Memo of Law in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") 13 (Dkt. No. 44).)  And, indeed, "[m]ajor life activities," at least as defined by the applicable regulations, include "breathing, . . . concentrating, thinking, [and] communicating."  29 C.F.R. § 1630.2(i)(1)(i).  Therefore, the relevant question is whether a reasonable jury could conclude from the evidence that Plaintiff's condition did "substantially limit[]" Plaintiff's ability to breathe, concentrate, think, or communicate.  *See* 42 U.S.C. § 12102(1)(A); 29 C.F.R. § 1630.2(i)(1)(i).

Nearly a decade ago, Congress found that, on the basis of what it thought was errant Supreme Court precedent, "lower courts ha[d] incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities." ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(a)(6), 122 Stat. 3553. Therefore, in order to "reinstat[e] a broad scope of protection to be available under the ADA," *id.* § 2(b)(1), Congress, among other things, specifically rejected the Supreme Court's decision in *Toyota Motor Manufacturing., Kentucky, Inc. v. Williams*, *see* ADA Amendments Act of 2008, Sec. 2(a)(5), which had held that the phrases "substantially limit[]" and "major life activities" "need[ed] to be interpreted strictly to create a demanding standard for qualifying as disabled," 534 U.S. 184, 197 (2002). Instead, Congress clarified that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," and that, accordingly, "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis," ADA Amendments Act of 2008, Pub. L. No. 110-325, § (2)(b)(5), 122 State. 3553, an intent which lives on in the regulations promulgated by the Equal Employment Opportunity Commission, *see* 29 C.F.R. § 1630.2(j)(iii) (directing that the "threshold issue" of whether a putative impairment "'substantially limits' a major life activity should not demand extensive analysis").

With that legal history in mind, the Court concludes that a reasonable jury could find that Plaintiff's breathing and abilities to concentrate, think, and communicate, (Pl.'s Opp'n 13), were substantially limited. The record contains evidence that Plaintiff was bedeviled by years of panic attacks that left him confused and struggling to breathe. (*See, e.g.*, Pl.'s Dep. Tr. 43, 45, 103, 108; Josephine Monroe Dep. Tr. 18, 27.) Moreover, the mental impairment that gave rise to these panic attacks is well documented in the record: Dr. Schild's patient chart shows that

Plaintiff had active diagnoses of "[a]goraphobia with panic disorder" and "[a]ttention deficit disorder of childhood with hyperactivity," (Lagitch Decl. Ex. K (medical records) 1), noting that "[Plaintiff] state[d] [that] he ha[d] a 5 year [history] of anxiety and panic," (*id.* at 26).[11] Likewise, the notion that Plaintiff had ongoing medical issues is further underscored by the many doctor's notes he submitted in connection with his absence from work, including at least one that noted that Plaintiff "was seen . . . for an acute illness" and was "advised to remain out of work" for over half a month.  (*See* Lagitch Decl. Ex. G (medical notes).)  On the basis of such evidence, and applying the generous standard codified in the post-2008 iteration of the ADA, this Court cannot say that any reasonable jury would conclude that Plaintiff's breathing was not substantially limited by his mental impairment.  *See, e.g.*, *Doers v. Lincare, Inc.*, No. 14-CV-3168, 2016 WL 853102, at *5 (M.D. Fla. Mar. 4, 2016) (finding "ample evidence that could allow a jury to find that [the plaintiff] [was] disabled under the ADA," where she "suffered from anxiety and panic disorder for approximately thirty years," "receive[d] medical treatment for her anxiety disorder," which at times "impact[ed] her ability to sleep, concentrate, and socialize," and gave rise to a doctor's note requesting certain relief); *Garlock v. The Ohio Bell Tel. Co.*, No. 13-CV-2200, 2015 WL 5730665, at *6 (N.D. Ohio Sept. 29, 2015) (denying summary judgment where the plaintiff "allege[d] his panic attacks affected his ability to think and interact with others," and where he "was being treated . . . for insomnia and nightmares and received medication to treat this condition"); *Dentice v. Farmers Ins. Exch.*, No. 10-CV-113, 2012 WL 2504046, at *11 (E.D. Wis. June 28, 2012) (noting that, "depending on its severity, anxiety may or may not constitute a disability," but concluding, "[i]n light of the expansive scope of the

---

[11] Plaintiff's patient file bears two sets of page numbers.  Page numbers cited by the Court in the context of this exhibit refer to the set that indicates that it is out of 28 pages total.

definition of 'substantial limitation" found in the revised ADA, "a triable issue of material fact with respect to whether [the plaintiff] [was] disabled under the ADA's statutory definition" existed where "[the plaintiff] was on a leave of absence from work for approximately nine months because of his generalized anxiety disorder, panic disorder, and diagnosed depression," and where he "received continued medical treatment for the symptoms he was experiencing as a result of these impairments, even continuing upon his return back to work").

The Court recognizes that this is a litigable conclusion, and reasonable counterarguments can and were made—although each is unavailing. First, it is, to be sure, not at all obvious that the outcome would have been the same prior to Congress' action in 2008. *See, e.g.*, *Price v. Mount Sinai Hosp.*, 458 F. App'x 49, 51 (2d Cir. 2012) (noting that, although "[the plaintiff] suffered from headaches, abdominal pain, weight loss, insomnia, and panic attacks, which her psychotherapist identified as symptoms of work-related stress and depression," and that "these symptoms caused [the plaintiff] difficulty with the major life activities of sleeping and eating," there was "no evidence [that] show[ed] that [the plaintiff's] impairments were *substantially* limiting); *Martinsky v. City of Bridgeport*, 814 F. Supp. 2d 130, 143–44 (D. Conn. 2011) (acknowledging that diagnosed "[p]anic [d]isorder[]" was "a quite serious disorder" according to an independent psychiatrist, but concluding under the pre-revision ADA that, even though the plaintiff's panic attacks caused him, among other things, shortness of breath, the plaintiff still "failed to present sufficient evidence that his mental impairment substantially limited non-work-related major life activities," where he could still work, interact with others, communicate with his children, and had improved sleep), *aff'd*, 504 F. App'x 43 (2d Cir. 2012);[12] *Treaster v.*

---

[12] For whatever it may be worth, the Court notes that, on appeal, the Second Circuit assumed for purposes of appeal that the plaintiff in *Martinsky* was disabled, affirming on different grounds. *See* 504 F. App'x at 47.

*Conestoga Wood Specialties, Corp.*, No. 09-CV-632, 2010 WL 2606479, at *30 n.20, *31 (M.D.

Pa. Apr. 29, 2010) (granting summary judgment to the defendant under the pre-amendment

ADA, even though an affidavit from the plaintiff's doctor indicated that "the plaintiff's panic

disorder affected the plaintiff's daily functioning including but not limited to her ability to sleep,

concentrate, focus and interact with others," on the grounds that, while "[the doctor's] affidavit

support[ed] an inference that the plaintiff's impairment affected [those abilities]," there was

"nothing in [the] affidavit that would reasonably support an inference that [those]

abilit[ies] . . . [were] substantially limited"), *adopted by* 2010 WL 2606481 (M.D. Pa. June 25,

2010).  However, Congress did take action, and Plaintiff's burden is now lighter.

Second, it is true, as intimated by Defendants' reply papers, (*see* Defs.' Reply 2–3), that

authority exists suggesting that "[c]ourts in the Second Circuit have consistently held that when a

plaintiff fails to offer any medical evidence substantiating the specific limitations to which he

claims he is subject due to his condition, he cannot establish that he is disabled within the

meaning of the ADA," *Baerga v. Hosp. for Special Surgery*, No. 97-CV-230, 2003 WL

22251294, at *6 (S.D.N.Y. Sept. 30, 2003) (internal quotation marks omitted); *see also Anderson

v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 136 (E.D.N.Y. 2015) (same).  It is also true that such a

principle may, in certain circumstances, warrant summary judgment where only the plaintiff's

say-so links his panic disorder to his limited abilities to work and concentrate.  *See Russell v.

Phillips 66 Co.*, — F. Supp. 3d —, 2016 WL 1651820, at *5 (N.D. Okla. Apr. 25, 2016)

(granting summary judgment to the defendant where the plaintiff "claim[ed] that he ha[d] been

diagnosed with major depressive disorder and panic disorder, and [that] th[o]se conditions

impair[ed] his ability to sleep, breathe, concentrate, and work," but where the plaintiff's

"arguments on th[e] issue [were] very general," where he "[did not] ma[k]e any attempt to link

[his] allegations to the evidence in the summary judgment record," and where "the medical evidence [did] not support his allegations"). However, the testimony of Plaintiff—and, for that matter, his wife—is not all that he offered. To the contrary, Dr. Schild's medical records lay bare Plaintiff's diagnoses, including agoraphobia with panic disorder. (*See* Lagitch Decl. Ex. K (medical records), at 1.) One struggles to understand how the "term 'substantially limits'" could be other than a "demanding standard," 29 C.F.R. § 1630.2(j)(1)(i), if the Court were to find it unmet despite testimony from a plaintiff and his wife concerning a plaintiff's panic attack symptoms, (*see* Pl.'s Dep. Tr. 43, 45, 103, 108; Josephine Monroe Dep. Tr. 18, 27), coupled by two documented, relevant diagnoses, (*see* Lagitch Decl. Ex. K (medical records), at 1), a medication regime for the treatment, (*see* Dr. Schild's June 13, 2012 Letter), significant time off work including for an "acute illness," (*see* Lagitch Decl. Ex. G (medical notes)), and a treatment regimen that continued at least through the date of Plaintiff's deposition, (*see* Pl.'s Dep. Tr. 41).

Finally, it is also true that there may be a conceptual disconnect between concluding that Plaintiff was disabled by virtue of his difficulty breathing generally at home and at work, (Pl.'s Dep. Tr. 47), when the crux of Plaintiff's lawsuit is that he was disabled for *work* purposes, giving an intuitive appeal to the notion that Plaintiff complains not about his disability that mattered for work purposes, but about symptoms more generally, (*see* Defs.' Mem. 10). However, that is simply what the law requires: The substantial limitation requirement is not a demanding one, 29 C.F.R. § 1630.2(j)(1)(i), and the Second Circuit long ago rejected the proposition that "there must be a causal link between the specific condition which limits a major life activity and the accommodation required," *Felix v. N.Y.C. Transit Auth.*, 324 F.3d 102, 104 (2d Cir. 2003). So recognizing, the Court is not persuaded that, even if "it would appear that [P]laintiff's primary contention is that his panic disorder substantially limits his ability to work,"

(Defs.' Mem. 9–10), this somehow militates against concluding that his breathing could have been substantially limited by his disorder in a manner that matters for purposes of this lawsuit too.

### ii. Working

The story is different with respect to whether the evidence permits the conclusion that Plaintiff's condition substantially limited his ability to work.  In moving for summary judgment, Defendants, purporting to quote 29 C.F.R. § 1630.2(j)(3)(i), stress that "in order to establish that [his] ability to work is substantially limited by his panic disorder and/or ADHD," Plaintiff would have to "demonstrate that he is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills[,] and abilities."  (Defs.' Mem. 10 (internal quotation marks omitted).)  In opposition, Plaintiff argues that, in so doing, "[D]efendants cite to regulatory language that has been deleted from the regulations and is no longer authoritative," and that "[t]he enactment of the ADAAA led to corresponding changes in relevant regulations," such that "[§] 1630.2 no longer requires a plaintiff seeking to rely upon an impaired ability to 'work' to prove that she is restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes."  (Pl.'s Opp'n 13 (some internal quotation marks omitted).)  While he is correct that § 1630.2 no longer contains that language, *see* 29 C.F.R. § 1630.2, Plaintiff ascribes too much significance to that change.  Indeed, "the EEOC Interpretive Guidance, which the Second Circuit has treated as authoritative," *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, No. 13-CV-243, 2014 WL 3867560, at *14 n.11 (E.D.N.Y. July 29, 2014) (citing *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999)), still notes today that, in the "rare cases" where a plaintiff "has a need to demonstrate that an impairment substantially limits him or

her in working," he or she "can do so by showing that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities," and has further characterized the removal of such language from the regulations as being "consistent with the fact that no other major life activity receives special attention in the regulation, and with the fact that, in light of the expanded definition of disability established by the Amendments Act, this major life activity will be used in only very targeted situations," 29 C.F.R. Pt. 1630, App. This observation has led other courts to convincingly conclude that "the test for determining whether a person's ability to work was substantially impaired has not changed." *Krachenfels*, 2014 WL 3867560, at *14 n.11; *see also Stevens v. Rite Aid Corp.*, No. 13-CV-783, 2015 WL 5602949, at *7–8 (N.D.N.Y. Sept. 23, 2015) (same), *appeal filed*, No. 15-3491 (2d Cir. Oct. 30, 2015). Here, Plaintiff has pointed to no evidence in the record sufficient to conclude that his "impairment substantially limits his . . . ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities." 29 C.F.R. Pt. 1630, App. Because "[t]he purpose of summary judgment . . . is . . . to narrow the issues for trial," *Graves v. Chubb & Son, Inc.*, No. 12-CV-568, 2014 WL 1289464, at *9 (D. Conn. Mar. 31, 2014), the Court concludes that Plaintiff has not raised a genuine dispute of material fact as to whether his impairment limited his ability to work.

> b. Was Plaintiff "Regarded As" Having an Impairment under the ADA?

Defendants also move for summary judgment to the extent that Plaintiff claims that he was "regarded as" having an impairment under the ADA. (*See* Defs.' Mem. 18–19.) A plaintiff meets the requirement of "being regarded as having such an impairment" if he or she "establishes that he or she has been subjected to an action prohibited under this chapter because

of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity," although not if the impairment is transitory—that is, when it has an actual or expected duration of six months or less—and minor.  42 U.S.C § 12102(3)(A)–(B); 29 C.F.R. § 1630.2(g)(1)(iii), (g)(2).  "Whether the impairment at issue is or would be 'transitory and minor' is to be determined objectively."  29 C.F.R. § 1630.15(f).  "[T]he 'regarded as' prong of the definition of disability . . . does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment."  29 C.F.R. § 1630.2(g)(3).

Here, there is sufficient evidence from which a jury could conclude that Plaintiff suffered from an "actual or perceived . . . mental impairment."  (*See, e.g.*, Mele Dep. Tr. 53 ("Q.  Did Colonel Orsino indicate to you that he felt that Mr. Monroe could not do his job?  A.  Yes.").)  That is sufficient to preclude summary judgment.  *See Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012) (finding it "clear" that, to defeat summary judgment on the "regarded as" issue, the plaintiff "was only required to raise a genuine issue of material fact about whether [the defendants] regarded him as having a mental or physical impairment"); *see also Darcy v. City of New York*, No. 06-CV-2246, 2011 WL 841375, at *1, *4 (E.D.N.Y. Mar. 8, 2011) (denying summary judgment on question of whether the plaintiff lieutenant in the police department was "regarded as" suffering from alcoholism where the deputy chief told the plaintiff that he "suffer[ed] from the same disease as [the deputy chief's] brother").  Summary judgment is therefore denied.[13]

---

[13] Indeed, Defendants' argument concerning the "regarded as" prong is half-hearted at best, arguing only that Plaintiff was not subject to an adverse employment action (to be addressed later) and that a failure-to-accommodate claim cannot be predicated upon a "regarded as" theory (true enough, *see* 29 C.F.R. § 1630.9(e), but hardly dispositive of Plaintiff's disability discrimination claim).  (*See* Defs.' Mem. 18–19.)

### c. Was There A "Record Of" Plaintiff's Disability?

"An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2(k)(1).  "Whether an individual has a record of an impairment that substantially limited a major life activity [is to] be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis."  *Id.* § 1630.2(k)(2).  "An individual will be considered to have a record of a disability if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment."  *Id.*  As the EEOC has explained, "[t]he intent of this provision, in part, is to ensure that people are not discriminated against because of a history of disability," although "[the] provision also ensures that individuals are not discriminated against because they have been misclassified as disabled."  29 C.F.R. Pt. 1630, App.  "The impairment indicated in the record"—which may include "education, medical, or employment records"—"must be an impairment that would substantially limit one or more of the individual's major life activities."  *Id.*

Here, Defendants argue that Plaintiff cannot establish a satisfactory record of disability because there was nothing in his doctor's notes that established that he was disabled within the meaning of the ADA.  (*See* Defs.' Mem. 19–20 (citing Lagitch Decl. Ex. G (medical notes); Dr. Schild's June 13, 2012 Letter).)  That position, however, demands too much from a doctor's note.  In Dr. Schild's June 13, 2012 note, he wrote that Plaintiff's "[w]orking diagnoses are Panic Disorder with Agoraphobia and Attention Deficit Hyperactivity Disorder."  (*See* Dr. Schild's June 13, 2012 Letter.)  Additionally, he explained that Plaintiff was "on medication to reduce

26

anxiety and panic, as well as enhancing attention and concentration." (*Id.*) It is true that, reading his letter, one would not know what "major life activit[y]," 29 C.F.R. § 1630.2(k)(1), was substantially limited. But a reasonable jury could conclude from his letter that Plaintiff had a record of disability that limited *some* major life activity. This is so for two reasons. First, as a practical matter, the Court is skeptical that many doctors' notes would provide that level of specificity, and, to insist upon it anyway would be hard to square with the "[b]road construction," *see* 29 C.F.R. § 1630.2(k)(2), applied to the record inquiry, *cf. E.E.O.C. v. Midwest Reg'l Med. Ctr., LLC.*, No. 13-CV-789, 2014 WL 3881418, at *4 (W.D. Okla. Aug. 7, 2014) (finding a record of a disability specified where the employee's doctor's letter "disclosed . . . that he was treating [the employee] for a carcinoma on her temple with radiation"). Second, the EEOC's interpretive guidance is instructive insofar as it provides an example of a satisfactory record of disability for purposes of this prong. There, the EEOC notes that "the 'record of' provision would protect an individual who was treated for cancer ten years ago but who is now deemed by a doctor to be free of cancer, from discrimination based on that prior medical history." 29 C.F.R. Pt. 1630, App. Although the average, medically lay employer almost certainly would understand that cancer is a serious medical condition, it is hardly obvious to the Court that the typical employer would be able to surmise what major life activity any given form of cancer would substantially limit. The fact that the EEOC regarded a record of earlier cancer—full stop—as sufficient to discharge the "record of" requirement without further discussion as to the extent to which that record unpacked the substantial limitation on a major life activity suggests that such specificity in the record need not be found. Third, it bears noting that an earlier version of the EEOC's administrative guidance, in force until May 23, 2011, read:

> The fact that an individual has a record of being a disabled veteran, or of disability retirement, or is classified as disabled for other purposes does not guarantee that

the individual will satisfy the definition of "disability" under part 1630. Other statutes, regulations and programs may have a definition of "disability" that is not the same as the definition set forth in the ADA and contained in part 1630. Accordingly, in order for an individual who has been classified in a record as "disabled" for some other purpose to be considered disabled for purposes of part 1630, the impairment indicated in the record must be a physical or mental impairment that substantially limits one or more of the individual's major life activities.

29 C.F.R. Pt. 1630, App. (pre-May 23, 2011 version).  Strikingly, the version of this language in force between May 24, 2011 and January 28, 2014, contains no such language.  *See* 29 C.F.R. Pt. 1630, App. (version between May 24, 2011 and January 28, 2014).  Because the latter applies to this case, *cf. Coale v. Metro-N. R.R. Co.*, No. 09-CV-2065, 2014 WL 975721, at \*12 (D. Conn. Mar. 12, 2014) ("The Interpretive Guidance . . . effective through May 23, 2011 . . . . is applicable to the case at bar given the dates in which all relevant events took place."), the Court takes its deletion of its predecessor's admonition to suggest that courts are not to be overly punctilious in insisting upon an unrealistic degree of specificity in doctors' notes.  Therefore, the Court declines to conclude that this is a case where "[the] plaintiff has not provided any . . . [medical] evidence . . . that [his] ability to perform [major life activities] . . . was substantially limited when compared to the general population," *Graham v. Three Vill. Cent. Sch. Dist.*, No. 11-CV-5182, 2013 WL 5445736, at \*15 (E.D.N.Y. Sept. 30, 2013) (internal quotation marks omitted), and denies summary judgment as to the "record of" prong.

### 2.  Was Plaintiff Qualified To Perform the Job's Essential Functions, Even If Only With Reasonable Accommodation?

Defendants next seek summary judgment on the grounds that "[Plaintiff] cannot prove that he was qualified to perform the essential functions of his job, whether with or without reasonable accommodation."  (Defs.' Mem. 12.)  A qualified individual within the meaning of § 12112(a) is one who, "with or without reasonable accommodation, can perform the essential

functions of the employment position that [he or she] holds or desires."  42 U.S.C. § 12111(8).

In addition, an employee may be found unqualified for his or her position because he or she

"pose[s] a direct threat to the health or safety of other individuals in the workplace."  42 U.S.C.

§ 12113(b).[14]  There is no serious question that, apart from his disability, Plaintiff was qualified

for his position as a correction officer.  Therefore, three subsidiary questions inhere in the

"qualified individual" inquiry in this case: (1) what the essential functions of Plaintiff's position

were, (2) whether Plaintiff, if only with reasonable accommodation, could perform them, and (3)

whether Plaintiff may still be unqualified for his position because he was a direct threat to safety.

The Court will walk through each of these questions in turn.

---

[14] The relevant statutory language provides that "[t]he term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace."  42 U.S.C. § 12113(b).  The phrase "qualification standards" does not appear in the definition for the phrase "[q]ualified individual," *see* 42 U.S.C. § 12111(8), and the "direct threat" inquiry has been characterized as an affirmative defense, *see Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78–79 (2002); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 222 (2d Cir. 2001).  However, "[i]n light of the nexus between the essential functions element and the direct threat defense, many courts singularly analyze the issue," *Makinen v. City of New York*, 53 F. Supp. 3d 676, 694 (S.D.N.Y. 2014); *see also Craddock v. Little Flower Children & Family Servs. of N.Y.*, No. 12-CV-5062, 2016 WL 755631, at *9 (E.D.N.Y. Feb. 25, 2016) (same).  This naturally gives way to the question "as to which party bears the burden of proving or disproving that an employee poses a direct threat," *Sista*, 445 F.3d at 170 n.3, a question which remains open in the Second Circuit, *see Makinen*, 53 F. Supp. 3d at 694 n.6 ("The [c]ourt is mindful that it is an open question in th[e] [Second] Circuit whether the plaintiff or defendant bears the burden of proof on the direct threat issue . . . .").  This is a hard question, *compare Pollard v. Drummond Co.*, No. 12-CV-3948, 2015 WL 5306084, at *6 (N.D. Ala. Sept. 10, 2015) ("In the Eleventh Circuit, the employee retains at all times the burden of persuading the jury either that he was not a direct threat or that reasonable accommodations were available." (alteration and internal quotation marks omitted)), *with Nutall v. Terminals*, No. 14-CV-4738, 2015 WL 9304350, at *6 (N.D. Ill. Dec. 22, 2015) ("A defendant moving for summary judgment [in the Seventh Circuit] bears the burden of showing that the evidence on the question of direct threat is so one-sided no reasonable jury could find for the non-moving party." (alteration and internal quotation marks omitted)), but one that the Court need not and therefore does not answer.

.                              a.  <u>What Were The Job's Essential Functions?</u>

In general, the phrase "essential functions" "means the fundamental job duties of the

employment position the individual with a disability holds or desires," but "does not include the

marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  The EEOC has further explained

that "[a] job function may be considered essential for any of several reasons, including" because

"the position exists is to perform that function," there is a "limited number of employees

available among whom the performance of that job function can be distributed," "[t]he function

[is] highly specialized so that the incumbent in the position is hired for his or her expertise or

ability to perform the particular function," or for other reasons entirely.  *See id.* § 1630.2(n)(2).

Although Congress specifically mandated that "consideration shall be given to [an] employer's

judgment as to what functions of a job are essential," and that "a written [job] description before

advertising or interviewing applicants for the job . . . shall be considered evidence of the

essential functions of the job," 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(n)(3)

(identifying same considerations), the EEOC's regulations also identify as relevant

considerations "[t]he amount of time spent on the job performing the function," "[t]he

consequences of not requiring the incumbent to perform the function," "[t]he terms of a

collective bargaining agreement," "[t]he work experience of past incumbents in the job," and

"[t]he current work experience of incumbents in similar jobs."  29 C.F.R. § 1630.2(n)(3)(iii)–

(vii); *see also Snowden v. Trs. of Columbia Univ.*, 612 F. App'x 7, 9 (2d Cir. 2015) (noting same

factors).  In conducting this analysis, "[u]sually, no one listed factor will be dispositive," and a

court is to "conduct a fact-specific inquiry into both the employer's description of a job and how

the job is actually performed in practice."  *McMillan*, 711 F.3d at 126 (internal quotation marks

omitted).

In this respect, Defendants argue that the "essential functions of the job for the position of correction officer are set forth in the Orange County Class Specification for such position." (Defs.' Mem. 13 (citing Lagitch Decl. Ex. Z ("Job Description").)[15]  And, indeed, that Job Description indicates as a "distinguishing feature[] of [the position]" the responsibility, on assigned shifts, for "the care, custody[,] and control" of the Jail's inmates, (*see* Job Description 1), language that Plaintiff himself has repeated, (*see* Pl.'s Dep. Tr. 28).  The Job Description also lists 16 "typical work activities," including "[m]aintain[ing] security at assigned posts throughout the Correctional Facility," which includes "mak[ing] timely rounds of assigned housing units." (*See* Job Description 1.)  The Job Description further identifies as "full performance knowledges [sic], skills, abilities[,] and personal characteristics" such traits as "mental alertness," "good judgment," and "reliability."  (*See id.* at 2.)

For his part, Plaintiff does not quibble with Defendant's identification of his job's essential functions, (*see* Pl.'s Dep. Tr. 28 ("Q.  And what were your duties as a correction officer?  A.  Care, custody[,] and control of the inmates.")); rather, he objects to the extent that the gloss Defendants put on these words forecloses the possibility that his job could be restructured to give him the option to work with a reduced number of inmates, as Dr. Schild recommended, (*cf.* Dr. Schild's Aug. 14, 2012 Letter (noting that the risk of panic attacks could be reduced if Plaintiff were "assigned dorms of [fewer] than 30 inmates, and which do not

---

[15] Even though the applicable regulation refers to "[w]ritten job descriptions prepared *before advertising or interviewing applicants* for the job," 29 C.F.R. § 1630.2(n)(3)(ii) (emphasis added), this language is not an insurmountable impediment to considerations of other job descriptions written by an employer, *see id.* § 1630.2(n)(3)(i) (referring to the "employer's judgment" as to which job functions are essential); *see also Flieger v. E. Suffolk Boces*, No. 13-CV-6282, 2016 WL 3527519, at *13 n.10 (E.D.N.Y. June 23, 2016) (acknowledging that "[t]he record [did] not indicate whether [the] job description was prepared before interviewing [the] [p]laintiff," but "consider[ing] the job description as evidence of [the employer's] judgment as to the essential functions of the teaching assistant position").

contain minors"); *see also* Pl.'s Opp'n 18–19 ("Defendants argu[e] that [P]laintiff could not perform the essential job functions of his position as a CO at the OC Jail and imply that . . . that the main essential job function to serve as a CO at the OC Jail is that all COs be able to work in assignments, at all times, with the largest number of inmates (i.e., fifty-six [56] or more) in their housing units, which is also false.")).  To the contrary, Plaintiff argues that "the record . . . is permeated by evidence that, after plaintiff suffered his panic attack on August 14th, . . . defendants [could] have . . . re-assign[ed] [Plaintiff] on a temporary basis [to] a post with a lesser number of inmates and with[out] minors . . . ."  (Pl.'s Opp'n 19.)  Although, from this, Defendants glean that "[P]laintiff argues . . . that inmate contact [was] not an essential function of the job of a correction officer at the OCSO," (Defs.' Reply 5), the Court does not understand there to be a serious dispute to be found within either the Parties' submissions or the record that custody, control, and care of inmates was an essential function of the position—and one which at least sometimes required inmate contact.

Conceptually, Plaintiff may yet be unable to perform the essential functions of his position if they included working in dorms that contained at least 30 inmates or minors.  Here, the evidence in the record simply does not bear that proposition out.  This is so for two reasons.  First, a reasonable jury could conclude on the basis of his evidence that Plaintiff *could* work in such a dorm and that his panic attack of August 14, 2012 was an aberration: After all, the evidence reflects that, despite being hired in 2001, (*see* Lagitch Decl. Ex. C (offer letter)), and having had his condition since at least roughly a year *before* then, (*see* Josephine Monroe Aff. ¶ 3), the panic attack of August 14, 2014 was a singular event, even if unhelpfully preceded by numerous absences, (*see* Defs.' 56.1 ¶ 15; Pl.'s 56.1 ¶ 15).  Such a conclusion would be further consistent with Dr. Schild's (admittedly pre-panic attack) June 13, 2012 view that, within a

week, Plaintiff could "return to full duty," (Dr. Schild's June 13, 2012 Letter), and his August

14, 2012 conclusion that "[Plaintiff] was ready to return to work," (Dr. Schild's August 14, 2012

Letter) and that his proposed assignment to less daunting dorms was perhaps a prophylactic

precaution, rather than an actual medical necessity, (*see* Dr. Schild's August 14, 2012 Letter ("I

feel the risk of future, similar episodes can be reduced if [Plaintiff] is assigned dorms of [fewer]

than 30 inmates, and which do not contain minors.")).  This latter proposition is further

corroborated by Dr. Schild's August 20, 2012 note in Plaintiff's file that he was "O.k. to return

to work, full duty."  (Lagitch Decl. Ex. K (medical records), at 25.)

Second, a reasonable jury could also conclude that correction officers could provide "the

care, custody[,] and control" of the facility's inmates, (*see* Job Description 1), without finding

themselves in such dorms, (*cf.* Jones Dep. Tr. 58–59 (noting that the Jail "[could not] change in

and out [correction officers serving] in the warehouse" because correction officers there "have

too many responsibilities" and that they therefore "might be there for a number of years before

they rotate back out"); Mele Dep. Tr. 32 (noting that there was "a permanent spot" for a

correction officer in the warehouse and that that position entailed "dealing with a lot of outside

entities" such as "building grounds[] [and] maintenance")).  At bottom, the Court is certainly

mindful that "a court must give considerable deference to an employer's judgment regarding

what functions are essential for service in a particular position," *Shannon v. N.Y.C. Transit Auth.*,

332 F.3d 95, 100 (2d Cir. 2003) (alteration and internal quotation marks omitted), logic that, the

Court thinks, is only more compelling where, as here, safety risks and an element of

unpredictability doubtlessly figure into the job, *cf. Bruzzese v. Lynch*, No. 13-CV-5733, 2016

WL 3220986, at *5 (E.D.N.Y. June 8, 2016) ("Significant deference [on the essential function

question] is especially appropriate in a situation involving a law enforcement agency, where a

mistake may contribute to an erosion in the public's trust in government, cost the state a significant amount of money in post hoc litigation, and result in the loss of innocent life."), *appeal filed*, No. 16-2775 (2d Cir. Aug. 8, 2016).  But testimony from Defendants' own employees indicates that at least some positions required less contact with inmates, and there is nothing in the record that compels the Court to conclude, at this stage, that maintaining "care, custody[,] and control" of inmates necessarily entails interacting with more than 30 inmates at a time or with minors.  Because an issue of fact exists as to whether the job's "essential functions" included such substantial inmate contact, summary judgment is inappropriate.

> b.  Could Plaintiff Perform, If Only With Reasonable Accommodation?

According to Plaintiff, reassigning Plaintiff on a temporary basis to a post with fewer inmates and no minors was a "reasonable accommodation" which would have enabled him to perform his job.  (*See* Pl.'s Opp'n 19–20.)  Even if Plaintiff, as of August 14, 2012 could not perform the essential functions of his job without help, there is at least a factual dispute surrounding whether Defendants could have reasonably accommodated Plaintiff in a manner that would ensure his ability to discharge his job duties.

The statute and regulations provide further guidance for determining what counts as a reasonable accommodation.  The relevant regulatory text explains that the term "reasonable accommodation" refers to, among other things, "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position."  29 C.F.R. § 1630.2(o)(1)(ii).  Examples of reasonable accommodation include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment

or modifications of examinations, training materials or policies, the provision of qualified readers

or interpreters, and other similar accommodations for individuals with disabilities."  42 U.S.C.

§ 12111(9); *see also* 29 C.F.R. § 1630.2(o)(2) (same).  While a court is certainly to "avoid

deciding cases based on unthinking reliance on intuition about the methods by which jobs are to

be performed," *McMillan*, 711 F.3d at 126 (internal quotation marks omitted), "[a] reasonable

accommodation can never involve the elimination of an essential function of a job," *Shannon*,

332 F.3d at 100; *see also Mineweaser v. City of North Tonawanda*, No. 14-CV-144, 2016 WL

3352046, at *9 (W.D.N.Y. Mar. 21, 2016) (same), *adopted by* 2016 WL 3279574 (W.D.N.Y.

June 15, 2016).  Likewise, "the ADA does not require creating a new position for a disabled

employee," *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 187 (2d Cir. 2006), nor does the ADA

require an employer to create a new light duty version of a position, *see Francis v. Wyckoff*

*Heights Med. Ctr.*, No. 13-CV-2813, 2016 WL 1273235, at *15 (E.D.N.Y. Mar. 30, 2016)

("[T]he ADA did not require [the employer] to create a new light duty rotation specifically to

accommodate [the] [p]laintiff's claimed disability."); *see also Clarke v. White Plains Hosp.*, —

F. App'x —, 2016 WL 3007172, at *1 (2d Cir. May 25, 2016) (noting that the defendant was not

"required to create a new [light duty] position to accommodate [the plaintiff]"); *Whitfield v. Am.*

*Storage & Transp., Inc.*, No. 12-CV-1622, 2014 WL 204705, at *1 (E.D.N.Y. Jan. 16, 2014)

(agreeing that a "defendant is not required to create a new light-duty position to accommodate

[the] plaintiff's physical limitations" (alterations and internal quotation marks omitted)), *aff'd*,

588 F. App'x 58 (2d Cir. 2014).  In establishing "the existence of some accommodation that

would allow him to perform the essential functions of his employment" a plaintiff "bears the

burdens of both production and persuasion."  *McMillan*, 711 F.3d at 126 (alterations omitted).

Here, there is ample evidence that some sort of "light duty" custom existed at the Jail. Sergeant Kiszka, for instance, testified that "if you were on light duty, you got placed in certain places," for instance, "[p]osts that were limited inmate contact."  (Kiszka Dep. Tr. 21.) Likewise, Undersheriff Jones testified, when asked whether, prior to Plaintiff's separation from the Jail, "there was any discussion as to . . . giving [Plaintiff] a reasonable accommodation for any kind of mental disability or mental condition," that "[the Jail] [does not] have reasonable accommodation[;] [it] ha[s] light duty."  (Jones Dep. Tr. 36.)[16]  But the evidence in the record suggests that the Jail's practice was not limited to considering requests for light duty following injuries, as described in the OCSO's "On-Duty/Off-Duty Injury Temporary Light Duty Reporting, Documenting[,] and Procedures" guidelines.  (*See* Light Duty Policy.)  To the contrary, Undersheriff Jones testified that he "[could] recall times when the state police would assign investigators to a desk job, say[,] during the court of a very ugly divorce where there [would be] a lot of stress and children [sic] and financial issues."  (Jones Dep. Tr. at 38.)

---

[16] Appropriately, Defendants' counsel objected to this question, quite likely because it calls for testimony as to a legal conclusion.  *Cf. Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010) ("[W]itnesses may not present testimony in the form of legal conclusions." (internal quotation marks omitted)).  Even if Plaintiff's counsel's question was not wholly appropriate, Undersheriff Jones' subsequent excursus on the Jail's light-duty policies plainly could be put in an admissible form at trial, because asking about Undersheriff Jones' familiarity with the Jail's light-duty policy is plainly within his personal knowledge.  *See, e.g.*, *Johnson v. Barney*, 360 F. App'x 199, 202 (2d Cir. 2010) (noting that prison employee could "testify as a lay witness regarding the policies and practices of the prison because he had personal knowledge of such policies and practices through his everyday experiences as an employee there").  Applying this same principle, admissible evidence cannot be found in those portions of Undersheriff Jones's deposition transcript in which he expounds on what he takes to be the meaning of "reasonable accommodation," positing that the phrase refers to a request for a permanent placement to another position and that granting reasonable accommodations would have an "obvious operational impact" upon law enforcement, inasmuch as "if you have a hundred police officers, and a certain segment of them are receiving reasonable accommodation, sooner or later, you run out of police officers that can get in the control [sic] car and go out and patrol."  (Jones Dep. Tr. 42–43.)

Elaborating, Undersheriff Jones said that "[t]hey would provide employment for an employee . . . that didn't require [the employee] to go out in public and do certain things," and that his practice was "a short-term ability to get over a hump." (*Id.*) Undersheriff Jones described this as an intermittently informal enterprise, explaining that he was "pretty sure that[,] from time to time, a lieutenant or a captain or someone in authority [would] provide a different work station to accommodate someone who has a bum knee or [was] going through a divorce or a breakup or a death in the family thing, or a whole host of things th[at] [a]ffect . . . employees," and that applicants "[did not] necessarily have to submit paperwork for that consideration," with such accommodations instead being "done on an ad hoc basis by  . . . supervisors." (*Id.* at 39)

Similarly, Lieutenant DiMarco also testified to an informal arrangement under which correction officers could be switched into less demanding positions on a short-term basis when necessary. Specifically, he testified that, "[i]f there was an officer that was experiencing a family problem, a stressful situation, a death in the family, anything that [Lieutenant DiMarco] may have discussed with [the officer] on [Lieutenant DiMarco's] security rounds, [he] would," in his discretion, "try to give [him or her] a less-intensive post the following day." (DiMarco Dep. Tr. 22.) Likewise, where an officer indicated that he or she was not "mentally" "a hundred percent," Lieutenant DiMarco would "try to give them a break." (*Id.* at 28.) Indeed, although Lieutenant DiMarco testified that he did not recall situations when he thought Plaintiff was not "a-hundred-percent mentally fit," DiMarco nevertheless testified that he had actually given Plaintiff units with fewer inmates. (*See id.* at 24, 29.) Like Undersheriff Jones, Lieutenant DiMarco also testified that, where officers were unable to perform a job due to injury, they could apply for "light-duty status" through the administration. (*See id.* at 27, 41.) Sergeant Kiszka also testified that "[a] lot of the correction officers always came to [the] sergeants and asked . . . , [']Can you,

maybe, put me in Delta Control, because it was an easier spot, or Medical 1[?']" (Santos Decl. Ex. 5 ("Kiszka Dep. Tr."), at 20.)

Even apart from the informal accommodation situation that existed in the prison, transferring officers from one role to another was hardly out of the ordinary.  For instance, there was a "visiting post" position, to which officers were not permanently assigned but would rather "rotate[] through," (*see* Mele Dep. Tr. 20), perhaps "serv[ing] . . . for a number of years, and [then] . . .mov[ing] on to other posts," (Jones Dep. Tr. 55).  Captain Mele testified that Colonel Orsino would solicit interest in various positions from the officers who would then bid on them, but that no criteria would be used to fill the spot.  (*See* Mele Dep. Tr. 21–22.)  Likewise, when an officer requested to be placed in a particular unit for any reason, Sergeant Kiszka testified that, "for the most part," the shift commander or lieutenant would honor the request, as long as it was on a limited basis.  (*See* Kiszka Dep. Tr. 21.)

And, indeed, there was a wide variety of such positions within the facility: For instance, Captain Mele could recall ones in "[p]rograms," "booking," "records," "lobby," "housing unit," "housing center," "[m]edical officer," "security control," "[s]upply," and "warehouse."  (Mele Dep. Tr. 25–26.)  These positions varied among themselves meaningfully: For instance, records apparently entailed relatively limited inmate contact, inasmuch as an officer in that position would interact with inmates when questions arose, but it was a position for which officers would have to qualify.  (*See* Mele Dep. Tr. 29–31.)  "Programs" required officers to interact with educators—"in effect, . . . run[] an in-house alternative high school."  (Jones Dep. Tr. 56.)  In contrast, the lobby position required an officer to be "weapon certified."  (*See* Mele Dep. Tr. 31.) Different still was the warehouse position, which Captain Mele understood had a "permanent spot."  (*See* Mele Dep. Tr. 32.)  Despite these various positions, however, there was also

38

testimony that "[correction officers'] primary task [was] working housing units." (Mele Dep. Tr. 17.) Where an officer expressed interest in a position for which he or she had to qualify, the evidence in the record also reflects that the prison would try to accommodate training requests. For instance, Lieutenant DiMarco testified that he had had conversations with officers "where they would say, [']Hey, if you ever get a chance, could you give me a shot at booking; could you give me a chance at . . . a hallway post?['] And [Lieutenant DiMarco] would say, 'If the situation presents itself, absolutely.'" (DiMarco Dep. Tr. 32.) Nevertheless, Lieutenant DiMarco testified that he "was a firm believer in seniority" as a hallmark of reliability, and would take it into account for purposes of considering requested changes in posts. (DiMarco Dep. Tr. 32–33.).

Consistent with this testimony, a reasonable jury could conclude that Plaintiff could help provide "the care, custody[,] and control" of the facility's inmates, (*see* Job Description 1), if his position were rejiggered. For instance, a reasonable jury could conclude that, as before, Plaintiff could be given housing units with fewer inmates, (*see* DiMarco Dep. Tr. 24), and that Plaintiff could request consideration for a specialized position, (*see id.* at 32). True, every position may not be a good match. For instance, Dr. Schild's advice that Plaintiff not work with minors, (*see* Dr. Schild's Aug. 14, 2012 Letter), would quite likely jibe poorly with the programs position, (*see* Jones Dep. Tr. 56.) But not all jobs were created equally: Just as Undersheriff Jones, when asked about the booking position, deemed it appropriate to inform Plaintiff's counsel that he was "leaving a very important element out," in that, "[i]n booking, the prisoner is first arriving at the facility, and is in [his or her] most volatile state, [his or her] most suicidal state, [his or her] most vulnerable state," (*see* Jones Dep. Tr. 68), a reasonable jury could conclude, for instance, that the inmates in laundry who "cook," "perform[] grass cutting," and "polish the facility," (*see id.* at

60), may be more manageable for Plaintiff.  And although Captain Mele, in his affidavit, said that, "[r]egardless of the post to which he or she is assigned, correction officer must be prepared to fill any given post at any point in time in any number of units in the facility depending on where the need arises," (Aff. of Capt. Anthony Mele ¶ 12 (Dkt. No. 30)), because the Second Circuit has instructed for essential functions purposes that a court is to "conduct a fact-specific inquiry into both the employer's description of a job and *how the job is actually performed in practice*," *McMillan*, 711 F.3d at 126 (emphasis added) (internal quotation marks omitted), the Court is not satisfied that the conceptual possibility for a spur-of-the-moment reconfiguration of work duties justifies granting summary judgment.  In short, the evidence is consistent with the notion that a reasonable jury could conclude that something could have been worked out for Plaintiff, including a short-term reprieve from certain work duties, with an effort to steer Plaintiff toward those duties as a correction officer that would not implicate his limitations.[17]

---

[17] In this respect, the EEOC's interpretive guidance is instructive.  In pertinent part, it says:

> An employer or other covered entity may restructure a job by reallocating or redistributing nonessential, marginal job functions.  For example, an employer may have two jobs, each of which entails the performance of a number of marginal functions.  The employer hires an individual with a disability who is able to perform some of the marginal functions of each job but not all of the marginal functions of either job.  As an accommodation, the employer may redistribute the marginal functions so that all of the marginal functions that the individual with a disability can perform are made a part of the position to be filled by the individual with a disability.  The remaining marginal functions that the individual with a disability cannot perform would then be transferred to the other position.

29 C.F.R. Pt. 1630, App.  It may be that working in housing units was an important duty of a correction officer; however, working in units with more than 30 inmates is, at best, a marginal component of that broader duty.  (*Cf.* DiMarco Dep. Tr. 25 (noting that he had assigned Plaintiff to units with 28 inmates each)).

c.  Was Plaintiff a "Direct Threat?"

As noted, Plaintiff may still not be qualified for his position if he "pose[d] a direct threat to the health or safety of other individuals in the workplace."  42 U.S.C. § 12113(b).  The phrase "direct threat" refers to "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation."  29 C.F.R. § 1630.2(r).[18]  "In order to be a significant risk, the probability of significant harm must be substantial, constituting more than a remote or slightly increased risk."  *Craddock v. Little Flower Children & Family Servs. of N.Y.*, No. 12-CV-5062, 2016 WL 755631, at *9 (E.D.N.Y. Feb. 25, 2016) (internal quotation marks omitted); *see also Makinen v. City of New York*, 53 F. Supp. 3d 676, 694 (S.D.N.Y. 2014) (same); *Doe v. Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, 345 (S.D.N.Y. 2010) (same); *Hatzakos v. Acme Am. Refrigeration, Inc.*, No. 03-CV-5428, 2007 WL 2020182, at *9 (E.D.N.Y. July 6, 2007) (same).  "The determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job," which shall, in turn, "be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."  29 C.F.R. § 1630.2(r); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 170 (2d Cir. 2006) ("The 'poses a direct threat defense' requires an individualized assessment of the employee's present ability to safely perform the essential functions of the job based on a reasonable medical judgment that relies on

---

[18] The statutory text somewhat more narrowly provides that "[t]he term 'direct threat' means a significant risk to the health or safety *of others* that cannot be eliminated by reasonable accommodation."  42 U.S.C. § 12111(3) (emphasis added).  The Supreme Court has already rejected the argument that § 12111(3) forecloses the EEOC's ability to classify a threat to oneself as a "direct threat," *Chevron*, 536 U.S. at 76,  and the Second Circuit has noted without objection that the EEOC guidelines "[e]xpand[ed] on the 'direct threat' language," *Lovejoy-Wilson*, 263 F.3d at 220.  Therefore, the breadth of the regulations, relative to the statute, is no issue.

the most current medical knowledge and/or on the best available objective evidence." (ellipses and some internal quotation marks omitted)).  "In determining whether an individual would pose a direct threat, the factors to be considered include: (1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm."  29 C.F.R. § 1630.2(r) (internal punctuation marks omitted).  While safety concerns are, of course, important, the EEOC interpretive guidance makes clear that a direct threat is not lightly found.  To the contrary, the EEOC instructs that

> [t]he assessment that there exists a high probability of substantial harm to the individual, like the assessment that there exists a high probability of substantial harm to others, must be strictly based on valid medical analyses and/or on other objective evidence. This determination must be based on individualized factual data, using the factors discussed above, rather than on stereotypic or patronizing assumptions and must consider potential reasonable accommodations.  Generalized fears about risks from the employment environment, such as exacerbation of the disability caused by stress, cannot be used by an employer to disqualify an individual with a disability.  For example, a law firm could not reject an applicant with a history of disabling mental illness based on a generalized fear that the stress of trying to make partner might trigger a relapse of the individual's mental illness. Nor can generalized fears about risks to individuals with disabilities in the event of an evacuation or other emergency be used by an employer to disqualify an individual with a disability.

29 C.F.R. Pt. 1630, App.  "The focal point" in a direct-threat analysis is "the ex ante reasonableness of a defendant's determination, not an ex post determination of its accuracy by the factfinder."  *Makinen*, 53 F. Supp. 3d at 697 (italics omitted).

Here, Defendants' direct-threat argument fails for several reasons.  First and clearest, there is, at the very least, a factual dispute over whether Defendants' assertion that Plaintiff was a direct threat was in any way based upon "an individualized assessment of [his] [then-]present ability to safely perform the essential functions of [his] job" that was "based on a reasonable medical judgment that relie[d] on the most current medical knowledge and/or on the best available objective evidence."  29 C.F.R. § 1630.2(r).  To the contrary, there is evidence that

Plaintiff presented Dr. Schild's letter to Captain Mele, who said, it was not "going to fly," (Pl.'s Dep. Tr. 121), but that, by August 20, 2012, Plaintiff's file indicated that he was "O.k. to return to work, full duty," (Lagitch Decl. Ex. K (medical records), at 25), and that, by letter August 28, 2012, Dr. Schild expressed her view that Plaintiff's "residual panic symptoms . . . appear to have resolved," (Schild's Aug. 28, 2012 Letter).  Although the direct-threat inquiry is not an exercise in Monday-morning quarterbacking, the circumstances upon which the relevant correctional facility officials came to learn of Plaintiff's condition and requested accommodations on August 14, 2012 suggest a lack of medically informed consideration of, inter alia, the gravity and likelihood of a risk of harm emanating from the fact that Plaintiff had a panic attack.  Absent such consideration, summary judgment is not warranted.

But two other points also counsel against granting summary judgment on direct-threat grounds.  First, as noted, a direct threat is to be found in harm that "cannot be . . . *reduced* by reasonable accommodation," 29 C.F.R. § 1630.2(r) (emphasis added), and, here, Dr. Schild's note—which Plaintiff showed to Captain Mele that evening, (*cf.* Pl.'s Dep. Tr. 121)—expressly posited that "the risk of future, similar episodes [could] be *reduced* if [Plaintiff] [could be] assigned dorms of [fewer] than 30 inmates, and which [would] not contain minors," (*see* Dr. Schild's Aug. 14, 2012 Letter (emphasis added)).  If a reasonable accommodation exists that would allow Plaintiff, at least temporarily, to serve in more manageable portions of the facility (and, as explained, the Court thinks a reasonable jury could so conclude), then harms flowing from a risk of another August 14-style panic attack recurring are not the stuff of direct threats.  If, as is so, a direct-threat defense fails upon summary judgment in the presence of conflicting evidence concerning whether firefighters need directly fight fires, *Hamlin v. Charter Twp. of Flint*, 165 F.3d 426, 431–32 (6th Cir. 1999), the Court thinks that the conflicting evidence

swirling around the question of the extent to which correction officers worked in minor-free

dorms of fewer than 30 inmates similarly counsels also against taking the issue from the jury.

Relatedly, a reasonable jury could conclude that the risk of harm from Plaintiff's panic

attacks did not meet the high threshold baked into the direct-threat analysis.  Given that a direct

threat must present a significant risk—that is, one that is "substantial" and "more than a remote

or slightly increased risk," *Craddock*, 2016 WL 755631, at *9—and given that Dr. Schild noted

by letter dated August 28, 2012 that Plaintiff's "residual panic symptoms . . . appear to have

resolved," (Schild's Aug. 28, 2012 Letter), a reasonable jury could conclude that the risk posed

by Plaintiff's condition, while real, was not serious enough to render him unqualified for his job,

*cf. Howard v. City of New York*, 62 F. Supp. 3d 312, 320 (S.D.N.Y. 2014) (finding that the

discharged police officer plaintiff's "assert[ion] that the disabling anxiety and panic attacks from

which he suffered were a temporary problem that had ended by the time he was terminated" was

insufficient to defeat summary judgment on direct-threat grounds, as "he . . . presented no

admissible medical or expert evidence in support of his belief that the Police Department's

diagnosis [that he was predisposed to anxiety] [was] wrong").  It may feel odd that an officer to

whom the "the care, custody[,] and control" of the facility's inmates were trusted, (*see* Job

Description 1), could suffer anxiety attacks and not be dubbed by the law a threat to others;

however, even conditions affecting persons in "dangerous and difficult" jobs that present

"unique and extreme" demands, *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998),

may not be "direct threats" by simple virtue of the fact that they suffer from a psychological

condition, *see Nelson v. City of New York*, No. 11-CV-2732, 2013 WL 4437224, at *4, *11

(S.D.N.Y. Aug. 19, 2013) ("[I]n light of [the] [p]laintiff's personal therapist's determination that

[the] [p]laintiff could tolerate the stress of the job [despite a psychological history of anxiety and

panic attacks], a genuine dispute of fact remains as to whether Plaintiff could return to the [New York Police Department] and perform the functions of a police officer.").

### 3.  Did Plaintiff Suffer An Adverse Employment Action?

Defendants next argue that Plaintiff did not suffer an adverse employment action because he was not forced to resign but rather quit his position.  (*See* Defs.' Mem. 17–18.)  The Parties dispute the relevant facts, and, so, summary judgment is inappropriate.

Under the ADA, "[t]o qualify as an adverse employment action, the employer's action toward the plaintiff must be materially adverse with respect to the terms and conditions of employment."  *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (internal quotation marks omitted).  To qualify, "[i]t must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  *Davis*, 804 F.3d at 235 (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) ("An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." (internal quotation marks omitted)).[19]  Well-known "[e]xamples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation," *Vega*, 801 F.3d at 85 (internal quotation marks omitted);

---

[19] At least to the extent relevant to this Motion, instructive analysis concerning adverse employment action can also be found in cases interpreting under Title VII, § 504 of the Rehabilitation Act, and 42 U.S.C. § 1981.  *See Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 329 n.14 (S.D.N.Y. 2015) ("An adverse employment action has the same meaning in ADA discrimination claims as it does in the Title VII context." (citing *Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 49 (2d Cir. 2014))); *Nelson*, 2013 WL 4437224, at *6 ("The standard for evaluating [the] [p]laintiff's claims under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, is the same as the standard applied to ADA claims.").

*Flieger*, 2016 WL 3527519, at *10 (same); however, another important one is constructive

discharge, *see Brailsford v. Zara USA, Inc.*, No. 14-CV-6999, 2016 WL 626560, at *5 (S.D.N.Y.

Feb. 16, 2016) ("A constructive discharge is 'functionally the same as an actual termination' and

therefore is considered an adverse employment action." (quoting *Pa. State Police v. Suders*, 542

U.S. 129, 148 (2004))); *see also Campbell v. N.Y.C. Transit Auth.*, 93 F. Supp. 3d 148, 170

(E.D.N.Y. 2015) (same), *appeal filed*, No. 15-1103 (2d Cir. Apr. 8, 2015).

　　　　To demonstrate the adverse employment action through constructive discharge, a plaintiff

must establish that (1) "he was discriminated against by his employer to the point where a

reasonable person in his position would have felt compelled to resign," and (2) "he actually

resigned."  *Green v. Brennan*, 136 S. Ct. 1769, 1777 (2016); *see also Terry v. Ashcroft*, 336 F.3d

128, 151–52 (2d Cir. 2003) ("An employee is constructively discharged when his employer,

rather than discharging him directly, intentionally creates a work atmosphere so intolerable that

he is forced to quit involuntarily."); *Smalls v. N.Y. Hosp. Med. Ctr. of Queens*, No. 13-CV-1257,

2015 WL 5437575, at *8 (E.D.N.Y. Sept. 15, 2015) ("Constructive discharge occurs when an

employee's 'employer, rather than discharging him directly, intentionally creates a work

atmosphere so intolerable that he is forced to quit involuntarily.'" (quoting *Petrosino v. Bell Atl.*,

385 F.3d 210, 229 (2d Cir. 2004))).  "A threat of termination may be evidence of a constructive

discharge if it presents the employee with the choice to resign or be fired," *Jackson v. Sleepy's,

LLC*, No. 13-CV-2086, 2016 WL 1223452, at *5 (E.D.N.Y. Mar. 29, 2016); *see also Rupert v.

City of Rochester, Dep't of Envtl. Servs.*, 701 F. Supp. 2d 430, 440 (W.D.N.Y. 2010) ("A triable

issue of fact as to constructive discharge may be demonstrated by proof that an employee was

presented with the decision to resign or be fired."), however, not all threats of termination fit the

bill, *see Moran v. Wegmans Food Markets, Inc.*, 65 F. Supp. 3d 327, 331 (W.D.N.Y. 2014)

(noting in ADA context that "mere 'threats' to terminate one's employment do not, by themselves, constitute adverse employment actions"); *Murray v. Town of North Hempstead*, 853 F. Supp. 2d 247, 269 (E.D.N.Y. 2012) ("[T]hreats of termination cannot, by themselves, constitute an adverse employment action.)).[20] "To determine whether threats of termination are sufficient to establish constructive discharge courts look at factors such as whether the threats of termination were repeated, direct, or involved additional adverse conduct." *Fotopolous v. Bd. of Fire Comm'rs*, 11 F. Supp. 3d 348, 366 (E.D.N.Y. 2014); *compare Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996) (finding summary judgment inappropriate where the plaintiff's boss yelled at her, mocked her, and told her that she would be "fired immediately if, over the course of two years, she did not maintain satisfactory performance levels, demonstrate satisfactory behavior, and improve her listening skills"), *and Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) (finding a statement that the plaintiff "would be fired at the end of the 90-day probationary period no matter what he did to improve his allegedly deficient

---

[20] Although a quick review of these decisions reveals that several of these cases involved adverse employment actions within the context of a retaliation claim, rather than a discrimination case, *see, e.g.*, *Murray*, 853 F. Supp. 2d at 269, they are no less instructive despite the well-established principle that adverse employment actions are broader in the retaliation context, *see, e.g.*, *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 224–25 (E.D.N.Y. 2014) ("The scope of actions that may be materially adverse for purposes of a Title VII retaliation claim is broader than those actions prohibited by Title VII's anti-discrimination provisions . . . .), because the constructive discharge can be an adverse employment action for purposes of either, *see, e.g.*, *Murray*, 853 F. Supp. 2d at 268–69 (retaliation); *Krachenfels*, 2014 WL 3867560, at *15 (discrimination).

Relatedly, it merits observation that in the Second Circuit, the scope of adverse employment actions is the same among *retaliation* claims under the First Amendment, Title VII, and the ADA. *See, e.g.*, *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (applying Title VII standard to Rehabilitation Act and ADA retaliation claims); *Karam v. County of Rensselaer*, No. 13-CV-1018, 2016 WL 51252, at *8 (N.D.N.Y. Jan. 4, 2016) (Title VII and First Amendment); *Solomon v. Southampton Union Free Sch. Dist.*, No. 08-CV-4822, 2011 WL 3877078, at *10 (E.D.N.Y. Sept. 1, 2011) (Title VII and ADA), *aff'd*, 504 F. App'x 60 (2d Cir. 2012).

performance" precluded summary judgment on constructive discharge), *and Fotopolous*, 11 F.

Supp. 3d at 367 (finding genuine dispute of material fact over adverse employment action where,

according to the plaintiff, "he was told to immediately sign the resignation letters presented to

him," or, "otherwise[,] he would be arrested and prosecuted, would never work again[,] and

would lose his benefits"), *and Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167,

178–79 (E.D.N.Y. 2013) (denying summary judgment in Title VII discrimination case on basis

of adverse employment action where, among other things, the plaintiff's union advisor informed

him that he would be fired if he did not resign and advised him to resign or risk irreparable

damage to his reputation, and the HR representative told the plaintiff that he would be terminated

if he did not resign, and that, if he did, she would discontinue an investigation into the plaintiff's

conduct), *and McCalla v. SUNY Downstate Med. Ctr.*, No. 03-CV-2633, 2006 WL 1662635, at

*2 (E.D.N.Y. June 8, 2006) (denying summary judgment where the plaintiff was presented with

a resignation letter, and told him that, if he did not sign it, his career would be ruined), *and*

*Valdes v. N.Y.C. Dep't of Envtl. Prot.*, No. 95-CV-10407, 1997 WL 666279, at *3 (S.D.N.Y.

Oct. 27, 1997) ("[The] plaintiff's allegation that his supervisors told him that 'it was best if [he]

resigned' because he 'was going to be terminated,' creates a triable issue of fact on the question

of whether a constructive discharge occurred." (alteration in original) (citation omitted)), *with*

*Murray*, 853 F. Supp. 2d at 256, 270 (finding no constructive discharge where the plaintiff town

employee was told by the town's attorney that the town supervisor wanted the plaintiff "out of

here" and where disciplinary proceedings were considered), *and Ciullo v. Yellow Book, USA,*

*Inc.*, No. 10-CV-4484, 2012 WL 2676080, at *9 (E.D.N.Y. July 6, 2012) (finding no adverse

employment action where "[the plaintiff] ha[d] not even alleged that a supervisor threatened him

with termination, but ma[d]e[] only the vague speculation that if he did not meet [certain] sales

goals, he could have been terminated at some point in the future"), *and Paulose v. N.Y.C. Dep't of Educ.*, No. 05-CV-9353, 2007 WL 1371517, at *2, *6 (S.D.N.Y. May 10, 2007) (finding that the plaintiff's "forced resignation [did] not constitute an adverse employment action because he was able to retract it shortly after it was tendered," even though the plaintiff teacher was pulled from his classroom, brought to the principal's office, and, at the request of the principal, assistant principal, and union chapter leader, signed a backdated letter tendering his resignation over "unforeseen family problems"), *and Jackson v. City Univ. of N.Y.*, No. 05-CV-8712, 2006 WL 1751247, at *4 (S.D.N.Y. June 23, 2006) (finding it "clear that [the] plaintiff did not suffer an 'adverse employment action' sufficient to establish a case for retaliation under the Rehabilitation Act" where the "plaintiff explained that he felt 'forced' to resign solely because his supervisor asked him to sign the resignation form").

Here, a jury would have a sufficient basis to conclude that Plaintiff's resignation was forced. To hear Plaintiff tell it, he reported for his "regular 3 p.m. shift" on August 15 and was told that Captain Mele wanted to see him. (*See* Pl.'s Dep. Tr. 120–21.) According to Plaintiff, Captain Mele told Plaintiff "this was [not] the job for [him]," and suggested that Plaintiff should perhaps go back to working at a car dealership, telling Plaintiff there was "no more talking to [his] wife" about leaving his current job. (*See id.* at 123–25.) Indeed, even Captain Mele testified that he told Plaintiff that Colonel Orsino indicated that Plaintiff had to work "full active duty . . . with no restrictions." (*See* Mele Dep. Tr. 58.) Additionally, according to Plaintiff, Captain Mele told Plaintiff that he could return to work in six months and gave Plaintiff a piece of paper and told him what to write before leaving, coming back, and telling him to add the phrase "for personal reasons," (*see* Pl.'s Dep. Tr. 126), although, according to Captain Mele, he simply told Plaintiff that "he needed to put a reason," and that he told Plaintiff that "[a] lot of

people write: Due to personal reasons," (*see* Mele Dep. Tr. 64).  And, perhaps consistent with

Plaintiff's testimony, there are two resignation letters in the record, the principal difference

between which is that the second includes the phrase "due to personal reasons."  (*Compare* First

Resignation Letter, *with* Second Resignation Letter.)  It is not hard to imagine that a person who

"reported for [his] regular shift," (Pl.'s Dep. Tr. 120), but ended up writing, (*see* First

Resignation Letter), and revising, (*see* Second Resignation Letter), a resignation letter at the

direction of a supervisor, (*see* Pl.'s Dep. Tr. 126), had no intention to quit when he came into

work that day, but did so because he was forced.  Under the circumstances, a genuine dispute of

material fact exists surrounding whether Plaintiff's resignation was voluntary, including the

circumstances around the modification of Plaintiff's letter, and summary judgment is therefore

inappropriate.  *See Mendoza v. City of Palacios*, 962 F. Supp. 2d 868, 870, 872 (S.D. Tex. 2013)

(denying summary judgment in case where the plaintiff police officer alleged that the police

chief told him that his doctor's note indicating that he needed to miss two days of work due to

high blood pressure was "bullshit," and demanded his resignation, reasoning that a jury could

conclude that his resignation was demanded based on a signed exit interview form listing

"resignation was demanded for health reasons," but characterizing the police officer's and police

chief's conflicting accounts of the events" as "a factual dispute that alone may be enough to get

past summary judgment" (alterations and internal quotation marks omitted)); *Bauers-Toy v.

Clarence Cent. Sch. Dist.*, No. 10-CV-845, 2014 WL 1745934, at *15 (W.D.N.Y. Apr. 30, 2014)

(finding in Title VII context that a reasonable jury could find that a choice that the plaintiff was

presented with required Plaintiff "to decide whether to accept a demotion and defend against

disciplinary proceedings, or resign," and that a reasonable jury could conclude that "such

decision was intended to force [the] [p]laintiff's involuntary resignation, which would constitute an adverse employment action").

Before moving on, it bears noting that this is a close call. For one thing, unlike a number of other cases where a constructive discharge was found on the basis of a threat of termination, here, it does not seem that Plaintiff risked anything more than job loss (and, perhaps, diminished odds of being rehired) by refusing to resign. *Cf. Fotopolous*, 11 F. Supp. 3d at 367 (involving the threat that, if the plaintiff did not resign, "he would be arrested and prosecuted, would never work again[,] and would lose his benefits"); *Dall*, 966 F. Supp. 2d at 178 (involving the threat that, if the plaintiff did not resign, he would do irreparable harm to his career). This distinction is not wholly inconsequential; however, the need for something more than the threat of job loss is hardly of such plain vitality that claims regularly stand or fall upon it. *See Grey v. City of Norwalk Bd. of Educ.*, 304 F. Supp. 2d 314, 324 (D. Conn. 2004) ("[T]hreats of termination alone are sometimes sufficient to show constructive discharge."). Additionally, although not briefed by the Parties, there is, from Plaintiff's perspective, some unhelpful law that suggests that where a terminated employee could have insisted upon a hearing before acceding to a forced resignation, he has not suffered an adverse employment action. *See Silverman v. City of New York*, 216 F. Supp. 2d 108, 116 (E.D.N.Y. 2002) ("[T]he fact that [the plaintiff] could have sought a hearing before being terminated eviscerates his claim that threats of termination created an 'intolerable' situation which left him with but one choice: resignation."), *aff'd*, 64 F. App'x 799 (2d Cir. 2003). Here, the record is clear that Plaintiff had to pass a civil service exam for his position, (*see* Lagitch Decl. Ex. D ("You must file for and successfully pass the next New York State Civil Service Exam for Correction Officer.")), and that Plaintiff successfully attained "permanent status" in his position, (*see* Lagitch Decl. Ex. F), something that may well matter

because, absent modification or replacement by a collective bargaining agreement, *see*

*Ciambriello v. County of Nassau*, 292 F.3d 307, 314 (2d Cir. 2002), under N.Y. Civil Service

Law § 75(1)(a), "[a] person holding a position by permanent appointment in the competitive

class of the classified civil service" "shall not be removed . . . except for incompetency or

misconduct shown after a hearing upon stated charges pursuant to this section."[21]   Nevertheless,

because, "[i]n reviewing a summary judgment motion, [a court] must resolve all ambiguities and

draw all reasonable inferences in the non-movant's favor," *Vt. Teddy Bear*, 373 F.3d at 244, and

because the extent to which Plaintiff could have insisted upon a hearing is, at best, ambiguous,

particularly in light of the lack of briefing on point, the consideration does not, in the context of

this Motion, counsel in favor of summary judgment.   Finally, it is obviously unhelpful to

Plaintiff that there is evidence in the record in which he characterized his separation from the Jail

as a resignation, particularly in connection with his pursuit of unemployment benefits.   (*See*

Defs.' 56.1 ¶¶ 42–43; Pl.'s 56.1 ¶¶ 42–43.)   However, while this may bear upon Plaintiff's

credibility at trial, it does not compel summary judgment at this stage.

## III.   Conclusion

For the foregoing reasons, the Court denies Defendant's Motion for Summary Judgment,

except grants it to the extent that Plaintiff seeks to establish a disability through a substantial

limitation on his ability to work.   The Clerk of the Court is respectfully requested to terminate

---

[21] Again, the issue was not briefed, but Plaintiff's job was quite likely within the competitive class.   *See* N.Y. Civ. Serv. Law § 44 ("The competitive class shall include all positions for which it is practicable to determine the merit and fitness of applicants by competitive examination, and shall include all positions now existing or hereafter created, of whatever functions, designations or compensation, in each and every branch of the classified service, except such positions as are in the exempt class, the non-competitive class or the labor class.").

the pending motion. (*See* Dkt. No. 28.) The Court will hold a conference on November 15,

2016, at 10:30 AM.

SO ORDERED.

Dated:     September 27 2016
              White Plains, New York

                                      KENNETH M. KARAS
                                      UNITED STATES DISTRICT JUDGE